Rehearing en banc granted by
order filed 2/5/98

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTY BRZONKALA,
<u>Plaintiff-Appellant,</u>

v.

VIRGINIA POLYTECHNIC INSTITUTE AND
STATE UNIVERSITY; ANTONIO J.
MORRISON; JAMES LANDALE CRAWFORD,
<u>Defendants-Appellees,</u>

and

CORNELL D. BROWN; WILLIAM E.
LANDSIDLE, in his capacity as
Comptroller of the Commonwealth,
<u>Defendants.</u>

LAW PROFESSORS; VIRGINIANS ALIGNED
AGAINST SEXUAL ASSAULT; THE

ANTI-DEFAMATION LEAGUE; CENTER FOR
WOMEN POLICY STUDIES; THE DC RAPE
CRISIS CENTER; EQUAL RIGHTS
ADVOCATES; THE GEORGETOWN
UNIVERSITY LAW CENTER SEX
DISCRIMINATION CLINIC; JEWISH WOMEN
INTERNATIONAL; THE NATIONAL
ALLIANCE OF SEXUAL ASSAULT
COALITIONS; THE NATIONAL COALITION
AGAINST DOMESTIC VIOLENCE; THE
NATIONAL COALITION AGAINST SEXUAL
ASSAULT; THE NATIONAL NETWORK TO
END DOMESTIC VIOLENCE; NATIONAL
ORGANIZATION FOR WOMEN; NORTHWEST
WOMEN'S LAW CENTER; THE
PENNSYLVANIA COALITION AGAINST
DOMESTIC VIOLENCE, INCORPORATED;

No. 96-1814

VIRGINIA NATIONAL ORGANIZATION FOR WOMEN; VIRGINIA NOW LEGAL DEFENSE AND EDUCATION FUND, INCORPORATED; WOMEN EMPLOYED; WOMEN'S LAW PROJECT; WOMEN'S LEGAL DEFENSE FUND; INDEPENDENT WOMEN'S FORUM; WOMEN'S FREEDOM NETWORK,
Amici Curiae.

UNITED STATES OF AMERICA,
Intervenor-Appellant,

and

CHRISTY BRZONKALA,
Plaintiff,

v.

ANTONIO J. MORRISON; JAMES LANDALE CRAWFORD,
Defendants-Appellees,

and

VIRGINIA POLYTECHNIC INSTITUTE AND

STATE UNIVERSITY; CORNELL D. BROWN; WILLIAM E. LANDSIDLE, in his capacity as Comptroller of the Commonwealth,
Defendants.

No. 96-2316

LAW PROFESSORS; VIRGINIANS ALIGNED AGAINST SEXUAL ASSAULT; THE ANTI-DEFAMATION LEAGUE; CENTER FOR WOMEN POLICY STUDIES; THE DC RAPE CRISIS CENTER; EQUAL RIGHTS ADVOCATES; THE GEORGETOWN UNIVERSITY LAW CENTER SEX

2

DISCRIMINATION CLINIC; JEWISH WOMEN INTERNATIONAL; THE NATIONAL ALLIANCE OF SEXUAL ASSAULT COALITIONS; THE NATIONAL COALITION AGAINST DOMESTIC VIOLENCE; THE NATIONAL COALITION AGAINST SEXUAL ASSAULT; THE NATIONAL NETWORK TO END DOMESTIC VIOLENCE; NATIONAL ORGANIZATION FOR WOMEN; NORTHWEST WOMEN'S LAW CENTER; THE PENNSYLVANIA COALITION AGAINST DOMESTIC VIOLENCE, INCORPORATED; VIRGINIA NATIONAL ORGANIZATION FOR WOMEN; VIRGINIA NOW LEGAL DEFENSE AND EDUCATION FUND, INCORPORATED; WOMEN EMPLOYED; WOMEN'S LAW PROJECT; WOMEN'S LEGAL DEFENSE FUND; INDEPENDENT WOMEN'S FORUM; WOMEN'S FREEDOM NETWORK,
Amici Curiae.

Appeals from the United States District Court for the Western District of Virginia, at Roanoke. Jackson L. Kiser, Senior District Judge. (CA-95-1358-R)

Argued: June 4, 1997

Decided: December 23, 1997

Before HALL, LUTTIG, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Motz wrote the majority opinion, in which Judge Hall joined. Judge Luttig wrote a dissenting opinion.

3

**COUNSEL**

**ARGUED:** Julie Goldscheid, NOW LEGAL DEFENSE AND EDUCATION FUND, New York, New York; Deborah L. Brake, NATIONAL WOMEN'S LAW CENTER, Washington, D.C.; Mark Bernard Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Kay Heidbreder, Associate General Counsel/Special Assistant Attorney General, VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY, Blacksburg, Virginia; Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., for Appellees. **ON BRIEF:** Martha F. Davis, NOW LEGAL DEFENSE AND EDUCATION FUND, New York, New York; Eileen N. Wagner, Richmond, Virginia, for Appellant Brzonkala; Frank W. Hunger, Assistant Attorney General, Robert P. Crouch, Jr., United States Attorney, Stephen W. Preston, Deputy Assistant Attorney General, Alisa B. Klein, Anne M. Lobell, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant United States. Jerry D. Cain, General Counsel/Special Assistant Attorney General, VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY, Blacksburg, Virginia; James S. Gilmore, III, Attorney General of Virginia, William H. Hurd, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee VPI. Hans F. Bader, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C.; W. David Paxton, M. Christina Floyd, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellee Morrison; Joseph Graham Painter, Jr., PAINTER, KRATMAN, PETHYBRIDGE, SWINDELL & CRENSHAW, Blacksburg, Virginia, for Appellee Crawford. Sara D. Schotland, Amy W. Schulman, CLEARY, GOTTLIEB, STEEN & HAMILTON, Washington, D.C., for Amicus Curiae Law Professors. Janice Redinger, VIRGINIANS ALIGNED AGAINST SEXUAL ASSAULT, Charlottesville, Virginia; Minna J. Kotkin, Sara Kay, Federal Litigation Program, BLS LEGAL SERVICES CORPORATION, Brooklyn, New York, for Amici Curiae Virginians Aligned Against Sexual Assault, et al. E. Duncan Getchell, Jr., J. William Boland, Robert L. Hodges, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Amicus Curiae Independent Women's Forum. Michael D. Weiss, LAWSON, WEISS &

4

DANZIGER, Houston, Texas, for Amicus Curiae Women's Freedom Network.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the gang rape of a freshman at the Virginia Polytechnic Institute by two members of the college football team, and the school's decision to impose only a nominal punishment on the rapists. The victim alleges that these rapes were motivated by her assailants' discriminatory animus toward women and sues them pursuant to the Violence Against Women Act of 1994. She asserts that the university knew of the brutal attacks she received and yet failed to take any meaningful action to punish her offenders or protect her, but instead permitted a sexually hostile environment to flourish; she sues the university under Title IX of the Education Amendments of 1972. The district court dismissed the case in its entirety. The court held that the complaint failed to state a claim under Title IX and that Congress lacked constitutional authority to enact the Violence Against Women Act. Because we believe that the complaint states a claim under Title IX and that the Commerce Clause provides Congress with authority to enact the Violence Against Women Act, we reverse and remand for further proceedings.

I.

Christy Brzonkala entered Virginia Polytechnic Institute ("Virginia Tech") as a freshman in the fall of 1994.**1** On the evening of September 21, 1994, Brzonkala and another female student met two men who Brzonkala knew only by their first names and their status as members of the Virginia Tech football team. Within thirty minutes of first meeting Brzonkala, these two men, later identified as Antonio Morrison and James Crawford, raped her.

_____

**1** "On appeal from an order granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6), we accept as true the facts alleged in the complaint." McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 327 (4th Cir. 1996).

5

Brzonkala and her friend met Morrison and Crawford on the third floor of the dormitory where Brzonkala lived. All four students talked for approximately fifteen minutes in a student dormitory room. Brzonkala's friend and Crawford then left the room.

Morrison immediately asked Brzonkala if she would have sexual intercourse with him. She twice told Morrison "no," but Morrison was not deterred. As Brzonkala got up to leave the room Morrison grabbed her, and threw her, face-up, on a bed. He pushed her down by the shoulders and disrobed her. Morrison turned off the lights, used his arms to pin down her elbows and pressed his knees against her legs. Brzonkala struggled and attempted to push Morrison off, but to no avail. Without using a condom, Morrison forcibly raped her.

Before Brzonkala could recover, Crawford came into the room and exchanged places with Morrison. Crawford also raped Brzonkala by holding down her arms and using his knees to pin her legs open. He, too, used no condom. When Crawford was finished, Morrison raped her for a third time, again holding her down and again without a condom.

When Morrison had finished with Brzonkala, he warned her "You better not have any fucking diseases." In the months following the rape, Morrison announced publicly in the dormitory's dining room that he "like[d] to get girls drunk and fuck the shit out of them."

Following the assault Brzonkala's behavior changed radically. She became depressed and avoided contact with her classmates and residents of her dormitory. She changed her appearance and cut off her long hair. She ceased attending classes and eventually attempted suicide. She sought assistance from a Virginia Tech psychiatrist, who treated her and prescribed anti-depressant medication. Neither the psychiatrist nor any other Virginia Tech employee or official made more than a cursory inquiry into the cause of Brzonkala's distress. She later sought and received a retroactive withdrawal from Virginia Tech for the 1994-95 academic year because of the trauma.

Approximately a month after Morrison and Crawford assaulted Brzonkala, she confided in her roommate that she had been raped, but could not bring herself to discuss the details. It was not until February

6

1995, however, that Brzonkala was able to identify Morrison and Crawford as the two men who had raped her. Two months later, she filed a complaint against them under Virginia Tech's Sexual Assault Policy, which was published in the Virginia Tech"University Policies for Student Life 1994-1995." These policies had been formally released for dissemination to students on July 1, 1994, but had not been widely distributed to students. After Brzonkala filed her complaint under the Sexual Assault Policy she learned that another male student athlete was overheard advising Crawford that he should have "killed the bitch."

Brzonkala did not pursue criminal charges against Morrison or Crawford, believing that criminal prosecution was impossible because she had not preserved any physical evidence of the rape. Virginia Tech did not report the rapes to the police, and did not urge Brzonkala to reconsider her decision not to do so. Rape of a female student by a male student is the only violent felony that Virginia Tech authorities do not automatically report to the university or town police.

Virginia Tech held a hearing in May 1995 on Brzonkala's complaint against Morrison and Crawford. At the beginning of the hearing, which was taped and lasted three hours, the presiding college official announced that the charges were being brought under the school's Abusive Conduct Policy, which included sexual assault. A number of persons, including Brzonkala, Morrison, and Crawford testified. Morrison admitted that, despite the fact that Brzonkala had twice told him "no," he had sexual intercourse with her in the dormitory on September 21. Crawford, who denied that he had sexual contact with Brzonkala (a denial corroborated by his suitemate, Cornell Brown), confirmed that Morrison had engaged in sexual intercourse with Brzonkala.

The Virginia Tech judicial committee found insufficient evidence to take action against Crawford, but found Morrison guilty of sexual assault. The university immediately suspended Morrison for two semesters (one school year), and informed Brzonkala of the sanction. Morrison appealed this sanction to Cathryn T. Goree, Virginia Tech's Dean of Students. Morrison claimed that the college denied him his due process rights and imposed an unduly harsh and arbitrary sanction. Dean Goree reviewed Morrison's appeal letter, the file, and

7

tapes of the three-hour hearing. She rejected Morrison's appeal and upheld the sanction of full suspension for the Fall 1995 and Spring 1996 semesters. Dean Goree informed Brzonkala of this decision in a letter dated May 22, 1995. According to Virginia Tech's published rules, the decision of Dean Goree as the appeals officer on this matter was final.

In the first week of July 1995, however, Dean Goree and another Virginia Tech official, Donna Lisker, personally called on Brzonkala at her home in Fairfax, Virginia, a four-hour drive from Virginia Tech. These officials advised Brzonkala that Morrison had hired an attorney who had threatened to sue the school on due process grounds, and that Virginia Tech thought there might be merit to Morrison's "ex post facto" challenge that he was charged under a Sexual Assault Policy that was not yet spelled out in the Student Handbook.[2] Dean Goree and Ms. Lisker told Brzonkala that Virginia Tech was unwilling to defend the school's decision to suspend Morrison for a year in court, and a re-hearing under the Abusive Conduct Policy that pre-dated the Sexual Assault Policy was required. To induce Brzonkala to participate in a second hearing, Dean Goree and Ms. Lisker assured her that they believed her story, and that the second hearing was a mere technicality to cure the school's error in bringing the first complaint under the Sexual Assault Policy.

The Virginia Tech judicial committee scheduled the second hearing for late July. This hearing turned out to be much more than a mere formality, however. The second hearing lasted seven hours, more than twice as long as the first hearing. Brzonkala was required to engage her own legal counsel at her own expense. Moreover, the university belatedly informed her that student testimony given at the first hearing would not be admissible at the second hearing and that if she

_____

[2] Brzonkala's complaint alleges that the Attorney General, who represented Virginia Tech, knew, or should have known, that Morrison's due process claim was meritless under Virginia law because of Abrams v. Mary Washington College, No. CH93-193, slip op. at 4 (Cir. Ct. City of Fredricksburg, April 27, 1994). The state court in Abrams rejected an almost identical claim that a student's due process rights were violated when he was charged and tried under a sexual assault policy that was adopted after the incident. Id. at 4.

8

wanted the second judicial committee to consider this testimony she would have to submit affidavits or produce the witnesses. Because she received insufficient notice, it was impossible for Brzonkala to obtain the necessary affidavits or live testimony from her student witnesses. In contrast, the school provided Morrison with advance notice so that he had ample time to procure the sworn affidavits or live testimony of his student witnesses. Virginia Tech exacerbated this difficulty by refusing Brzonkala or her attorney access to the tape recordings of the first hearing, while granting Morrison and his attorney complete and early access to those tapes. Finally, Virginia Tech officials prevented Brzonkala from mentioning Crawford in her testimony because charges against him had been dismissed; as a result she had to present a truncated and unnatural version of the facts.

Nevertheless, after the second hearing, the university judicial committee found that Morrison had violated the Abusive Conduct Policy, and re-imposed the same sanction: an immediate two semester suspension. On August 4, 1995, the college again informed Brzonkala, in writing, that Morrison had been found guilty and been suspended for a year.

Morrison again appealed. He argued due process violations, the existence of new information, and the asserted harshness and arbitrariness of the sanction imposed on him as grounds for reversal of the judicial committee's decision. Senior Vice-President and Provost Peggy Meszaros overturned Morrison's sanction on appeal. She found "that there was sufficient evidence to support the decision that [Morrison] violated the University's Abusive Conduct Policy and that no due process violation occurred in the handling of[Morrison's] case." However, the Provost concluded that the sanction imposed on Morrison -- immediate suspension for one school year-- was "excessive when compared with other cases where there has been a finding of violation of the Abusive Conduct Policy." Provost Meszaros did not elaborate on the "other cases" to which she was referring. Instead of an immediate one year suspension, the Provost imposed "deferred suspension until [Morrison's] graduation from Virginia Tech." In addition, Morrison was "required to attend a one-hour educational session with Rene Rios, EO/AA Compliance Officer regarding acceptable standards under University Student Policy."

9

Provost Meszaros informed Morrison of the decision to set aside his sanction by letter on August 21, 1995. Although Brzonkala had been informed in writing of the result at every other juncture in the disciplinary proceedings, Virginia Tech did not notify her that it had set aside Morrison's suspension or that he would be returning to campus in the Fall. Instead, on August 22, 1995, Brzonkala learned from an article in <u>The Washington Post</u> that the university had lifted Morrison's suspension and that he would return in the Fall 1995 semester. In fact, Morrison did return to Virginia Tech in the Fall of 1995 -- on a full athletic scholarship.

Upon learning that the university had set aside Morrison's suspension and was permitting him to return in the Fall, Brzonkala canceled her own plans to return to Virginia Tech. She feared for her safety because of previous threats and Virginia Tech's treatment of Morrison. She felt that Virginia Tech's actions signaled to Morrison, as well as the student body as a whole, that the school either did not believe her or did not view Morrison's conduct as improper. She was also humiliated by the procedural biases of the second hearing and by the decision to set aside the sanction against Morrison. Brzonkala attended no university or college during the Fall 1995 term.

On November 30, 1995, Brzonkala was shocked to learn from another newspaper article that the second Virginia Tech judicial committee did not find Morrison guilty of sexual assault, but rather of the reduced charge of "using abusive language." Despite the fact that the school had accused and convicted Morrison of sexual assault at the initial hearing, despite Morrison's testimony at that hearing that he had had sexual intercourse with Brzonkala after she twice told him "no," and despite the fact that Dean Goree and Donna Lisker had unambiguously stated that the second hearing would also address the "sexual assault" charge against Morrison, the administrators altered the charge. The university never notified either Brzonkala or her attorney about the change, leaving her to learn about it months after the fact from a newspaper article.

Brzonkala believes and so alleges that the procedural irregularities in, as well as the ultimate outcome of, the second hearing were the result of the involvement of Head Football Coach Frank Beamer, as

10

part of a coordinated university plan to allow Morrison to play football in 1995.

On December 27, 1995, Brzonkala initially filed suit against Morrison, Crawford, and Virginia Tech; on March 1, 1996, she amended her complaint. She alleged inter alia that Virginia Tech, in its handling of her rape claims and failure to punish the rapists in any meaningful manner, violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (1994). She also alleged that Morrison and Crawford brutally gang raped her because of gender animus in violation of Title III of the Violence Against Women Act of 1994, 42 U.S.C. § 13981 (1994) ("VAWA"). The United States intervened to defend the constitutionality of VAWA.

On May 7, 1996 the district court dismissed the Title IX claims against Virginia Tech for failure to state a claim upon which relief could be granted. See Brzonkala v. Virginia Polytechnic & State Univ., 935 F. Supp. 772 (W.D. Va. 1996) (" Brzonkala I"). On July 26, 1996 the court dismissed Brzonkala's VAWA claims against Morrison and Crawford, holding that although she had stated a cause of action under VAWA, enactment of the statute exceeded Congressional authority and was thus unconstitutional. See Brzonkala v. Virginia Polytechnic & State Univ., 935 F. Supp. 779 (W.D. Va. 1996) ("Brzonkala II").

II.

Title IX of the Education Amendments of 1972 provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance .. . .

20 U.S.C. § 1681(a).

Virginia Tech concedes that it is an "education program . . . receiving Federal financial assistance." Hence, we need only determine

11

whether Brzonkala has stated a claim that she was "subjected to discrimination" by Virginia Tech "on the basis of sex." 20 U.S.C. § 1681(a). The district court recognized that Brzonkala pled a Title IX claim on the basis of two distinct legal theories: a hostile environment theory, that Virginia Tech responded inadequately to a sexually hostile environment; and a disparate treatment theory, that Virginia Tech discriminated against Brzonkala because of her sex in its disciplinary proceedings.**3** The district court rejected both, holding that her complaint failed to state a Title IX claim on which relief could be granted under either theory. See Brzonkala I, 935 F. Supp. at 775-78. We now consider whether Brzonkala stated a claim under either of these theories.

A.

We begin with the hostile environment claim.**4** To assess Brzonkala's Title IX hostile environment assertions we must address two issues: (1) what legal standard to apply to a hostile environment claim under Title IX and (2) whether Brzonkala's complaint satisfies that standard.

---

**3** Brzonkala also pled a claim of disparate impact based upon Virginia Tech's policy of not automatically reporting allegations of rape to the police. Brzonkala does not press this theory on appeal. We deem it waived.

**4** Virginia Tech makes a truncated argument, without reference to the complaint or any authority, that Brzonkala has not pled a hostile environment claim with sufficient specificity. The district court "glean[ed] from [Brzonkala's] complaint an allegation that [Virginia Tech] had a hand in permitting a hostile school environment based on Brzonkala's gender." Brzonkala I, 935 F. Supp. at 778. We agree that Brzonkala has properly pled a hostile environment claim. All that Brzonkala was required to plead was "`a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. . . . Following the simple guide of Rule 8(f) that `all pleadings shall be so construed as to do substantial justice,' we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis." Conley v. Gibson, 355 U.S. 41, 47-48 (1957) (footnote omitted).

12

1.

Title IX unquestionably prohibits federally supported educational institutions from practicing "discrimination""on the basis of sex." 20 U.S.C. § 1681(a) (1994). Because of Title IX's"short historical parentage," Doe v. Claiborne County, Tenn., 103 F.3d 495, 514 (6th Cir. 1996), we have not previously faced a hostile environment claim under Title IX. Therefore, in determining whether an educational institution's handling of a known sexually hostile environment is actionable "discrimination" under Title IX, we must look to the extensive jurisprudence developed in the Title VII context. See Preston v. Virginia ex rel. New River Community College, 31 F.3d 203, 207 (4th Cir. 1994) ("Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX."); Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 832 (10th Cir. 1993) ("Title VII . . . is `the most appropriate analogue when defining Title IX's substantive standards . . . .'"); Lipsett v. University of P.R., 864 F.2d 881, 896 (1st Cir. 1988) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination" Title VII is "the most appropriate analogue when defining Title IX's substantive standards . . . .") (citation omitted); see also Franklin v. Gwinnett County Public Sch., 503 U.S. 60, 75 (1992) (holding Title IX provides a private cause of action for damages arising from sexual harassment and relying on Meritor Sav. Bank v. Vinson, 477 U.S. 57, 64 (1986), a Title VII hostile environment case, to define"discrimination" under Title IX); H.R. Rep. No. 554 (1971) reprinted in 1972 U.S.C.C.A.N. 2462, 2512 (explaining that Title IX meant to provide coverage similar to Title VII for "those in education"); and the many cases adopting Title VII analysis in a Title IX hostile environment context listed infra at 21-22.**5** The district court properly followed this approach and applied Title VII standards to determine Virginia Tech's liability for a hostile environment under Title IX. See Brzonkala I, 935 F. Supp. at 776-78.

_____

**5 But see Smith v. Metro. Sch. Dist. Perry Township**, No. 95-3818, 1997 WL 656772 (7th Cir. Oct. 22, 1997) (recognizing that most other courts apply Title VII principles to Title IX cases but refusing to apply Title VII's "knew or should have known" standard to a Title IX claim).

Virginia Tech argues that this was error, relying solely upon Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006 (5th Cir.), cert. denied, 117 S. Ct. 165 (1996). Rowinsky dealt with a hostile environment claim by two female students against a school district for its response to sexual harassment by certain male students. A divided panel of the Fifth Circuit defined the question presented as "whether the recipient of federal education funds can be found liable for sex discrimination when the perpetrator is a party other than the grant recipient or its agents." Id. at 1010. In answering this question, the court determined that the language and legislative history of Title IX indicated that the statute "applies only to the practices of the recipients themselves," not third parties. Id. at 1013. The Rowinsky court reasoned that Title VII principles were inapplicable because "[i]n an employment context, the actions of a co-worker sometimes may be imputed to an employer through a theory of respondeat superior," but a school may not be held responsible for the harassment of one student by another. Id. at 1011 n.11. Accordingly, the Fifth Circuit held that "[i]n the case of [Title IX] peer sexual harassment, a plaintiff must demonstrate that the school district responded to sexual harassment claims differently based on sex. Thus, a school district might violate Title IX if it treated sexual harassment of boys more seriously than sexual harassment of girls . . . ." Id. at 1016.

We have no trouble agreeing with the Fifth Circuit that Title IX "applies only to the practices of the recipients themselves." Id. at 1013. However, in this respect Title IX is no different from Title VII -- the Rowinsky majority's failure to recognize this results in a deeply flawed analysis. In framing the question in terms of liability for the acts of third parties, Rowinsky misstates what a plaintiff, under either Title VII or Title IX, hopes to prove in a hostile environment claim. Under Title VII, a plaintiff cannot recover because a fellow employee sexually harassed the plaintiff, but only because an employer could have, but failed to, adequately remedy known harassment. As we recently noted, "an employer is liable for a sexually hostile work environment created by . . . [an] employee only if the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996) (emphasis added). Consequently, a defendant employer is held responsible under Title VII for

14

the employer's own actions, its inadequate and tardy response, not the actions of fellow employees.[6]

Similarly, in a Title IX hostile environment action a plaintiff is not seeking to hold the school responsible for the acts of third parties (in this case fellow students). Rather, the plaintiff is seeking to hold the school responsible for its own actions, i.e. that the school "knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Andrade, 88 F.3d at 261. Brzonkala is not attempting to hold Virginia Tech responsible for the acts of Morrison and Crawford per se; instead she is challenging Virginia Tech's handling of the hostile environment once she notified college officials of the rapes. Therefore, the entire focus of Rowinsky's analysis as to whether a school may be held responsible for the acts of third parties under Title IX misses the point. Brzonkala does not seek to make Virginia Tech liable for the acts of third parties. She seeks only to hold the school liable for its own discriminatory actions in failing to remedy a known hostile environment.

A defendant educational institution, like a defendant employer, is, of course, liable for its own discriminatory actions: even the Rowinsky majority acknowledges this. Rowinsky, 80 F.3d at 1012 (Title IX "prohibits discriminatory acts" by educational institutions receiving federal financial assistance). Responsibility for discriminatory acts includes liability for failure to remedy a known sexually hostile environment. Accordingly, the district court was correct in applying Title VII principles to define the contours of Brzonkala's hostile environment claim. We now turn to that application.

_____

[6] After oral argument in this case, the Eleventh Circuit followed Rowinsky, see Davis v. Monroe County Bd. of Educ., 120 F.3d 1390 (11th Cir. 1997), but the Ninth Circuit flatly rejected the Rowinsky rationale. See Oona v. McCaffrey, 122 F.3d 1207 (9th Cir. 1997). As explained above, we, like the Ninth Circuit, "have difficulty squaring Rowinsky's reasoning with the Supreme Court's in Franklin" and our own circuit precedent, e.g., Preston, 31 F.3d at 207, and Andrade, 88 F.3d at 261. See Oona, 122 F.3d at 1210.

15

2.

Under Title VII "to prevail on a `hostile work environment' sexual harassment claim, an employee must prove: (1) that he [or she] was harassed `because of' his [or her] `sex'; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996). Similarly, under Title IX a plaintiff asserting a hostile environment claim must show: "1) that she [or he] belongs to a protected group; 2) that she [or he] was subject to unwelcome sexual harassment; 3) that the harassment was based on sex; 4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her [or his] education and create an abusive educational environment; and 5) that some basis for institutional liability has been established." Kinman v. Omaha Public Sch. Dist., 94 F.3d 463, 467-68 (8th Cir. 1996); Seamons v. Snow, 84 F.3d 1226, 1232 (10th Cir. 1996) (same); Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir. 1995), cert. denied, 116 S. Ct. 1044 (1996) (same); Nicole M. v. Martinez Unified Sch. Dist., 964 F. Supp. 1369, 1376 (N.D. Cal. 1997) (same); see also Doe, 103 F.3d at 515 (holding that the elements of a "hostile environment claim under Title VII equally apply under Title IX"); Oona, R.S. v. McCaffrey, 122 F.3d 1207, 1210 (9th Cir. 1997) (applying Title VII standards to Title IX hostile environment claim); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 248-51 (2d Cir. 1995) (same); Collier v. William Penn Sch. Dist. , 956 F. Supp. 1209, 1213-14 (E.D. Pa. 1997) (same); Pinkney v. Robinson, 913 F. Supp. 25, 32 (D.D.C. 1996) (same); Bosley v. Kearney R-1 School Dist., 904 F. Supp. 1006, 1021-22 (W.D. Mo. 1995) (same); Kadiki v. Virginia Commonwealth Univ., 892 F. Supp. 746, 749-50 (E.D. Va. 1995) (same); Ward v. Johns Hopkins Univ., 861 F. Supp. 367, 374 (D. Md. 1994) (same).

Virginia Tech concedes that Brzonkala has properly alleged the first three elements -- that she was a member of a protected class, that she was subject to unwelcome harassment, and that this harassment was based on her sex. Virginia Tech contends, however, that Brzonkala has not alleged that she was subjected to a sufficiently abu-

sive environment, or established that Virginia Tech may be held liable for that environment. Accordingly, we address these two elements.

a.

A Title IX plaintiff must allege sexual harassment"sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment." Kinman, 94 F.3d at 468. Virginia Tech argues that because Brzonkala did not return to school she experienced no hostile environment. The district court agreed, holding that:

> [T]he hostile environment that Brzonkala alleged never occurred. Brzonkala left [Virginia Tech] due to her concern of possible future reprisal in reaction to her pressing charges. She did not allege that this future reprisal actually occurred. Second, Brzonkala did not perceive that the environment was in fact abusive, but only that it might become abusive in the future.

Brzonkala I, 935 F. Supp. at 778.

Brzonkala pled that she was violently gang raped, and rape "is `not only pervasive harassment but also criminal conduct of the most serious nature' that is `plainly sufficient to state a claim for `hostile environment' sexual harassment.'" Gary v. Long , 59 F.3d 1391, 1397 (D.C. Cir.), cert. denied, 116 S. Ct. 569 (1995) (quoting Meritor, 477 U.S. at 67); cf. Brock v. United States, 64 F.3d 1421, 1423 (9th Cir. 1995) ("Just as every murder is also a battery, every rape committed in the employment setting is also discrimination based on the employee's sex."); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (citing Meritor and recognizing sexual assault as an extreme example of sexual harassment); Karen Mellencamp Davis, Note, Reading, Writing, and Sexual Harassment: Finding a Constitutional Remedy When Schools Fail to Address Peer Abuse, 69 Ind. L.J. 1123, 1124 (1994) ("Rape and molestation provide drastic examples of the types of sexual harassment students inflict on their peers.").

Moreover, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates

17

an abusive work environment for purposes of Title VII liability." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) (citing Meritor, 477 U.S. at 67); see also King v. Board of Regents, 898 F.2d 533, 537 (7th Cir. 1990) (acknowledging that "a single act [of discrimination] can be enough" to state a hostile environment claim under Title VII).

Thus, the district court failed to recognize that the rapes themselves created a hostile environment, and that Virginia Tech was aware of this environment and never properly remedied it. Indeed, the university Provost's rationale for overturning Morrison's immediate suspension for one school year -- that this punishment was "excessive when compared with other cases" -- itself evidences an environment hostile to complaints of sexual harassment and a refusal to effectively remedy this hostile environment. Given the seriousness of the harassment acts, the total inadequacy of Virginia Tech's redress, and Brzonkala's reasonable fear of unchecked retaliation including possible violence, Brzonkala did not have to return to the campus the next year and personally experience a continued hostile environment. Brzonkala "should not be punished for a hostile environment so severe that she was forced out entirely by loss of her legal claim against those responsible for the situation." Patricia H. v. Berkeley Unified Sch. Dist., 830 F. Supp. 1288, 1298 (N.D. Cal. 1993); see also Carrero v. New York City Housing Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII.").

b.

The remaining issue is whether "some basis for institutional liability has been established." Seamons, 84 F.3d at 1232. "[A]n employer is liable for a sexually hostile work environment created by . . . [an] employee only if the employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Andrade, 88 F.3d at 261. We must determine whether Brzonkala has alleged facts sufficient to support an inference that Virginia Tech "knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Virginia Tech certainly knew about the rapes once Brzonkala informed the school and initi-

18

ated disciplinary proceedings against Morrison and Crawford. The question, therefore, is whether Virginia Tech took prompt and adequate remedial action once it was on notice of the rapes. See Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir. 1990) (en banc). This inquiry is necessarily fact-based, and whether a response is "prompt and adequate" will depend on the specific allegations (and ultimately evidence) in each case. Id. at 106-07.

Brzonkala alleges that after she was brutally raped three times she ceased attending classes, attempted suicide, and sought the aid of the school psychiatrist. Despite Virginia Tech's awareness of these developments no university official, including the psychiatrist, ever made more than a cursory inquiry into the cause of her distress. Furthermore, she alleges that when she directly reported the rapes to Virginia Tech authorities, the college neither provided a fair hearing nor meted out appropriate punishment. During the first hearing her attacker essentially admitted that he raped her after she twice told him no. The first hearing resulted in a finding that Morrison had committed sexual assault, and his suspension for one school year. This result was upheld by an appeals officer, and under Virginia Tech's published rules that decision was final and not subject to change.

Nevertheless, Virginia Tech voided the first hearing and reopened the case against her admitted rapist, assertedly in violation of its own rules and on the basis of a specious legal argument. The second hearing was procedurally biased against Brzonkala in numerous ways, and unbeknownst to her, Morrison was only charged with the lesser offense of using abusive language. Still, Morrison was again found guilty, and suspended for the next school year. On appeal a senior college official determined that there was sufficient evidence that Morrison had violated the University's Abusive Conduct Policy, and that Morrison's due process argument was meritless. Nonetheless, the appeals officer decided that suspending Brzonkala's rapist for a school year was "excessive when compared with other cases." The university then overturned that suspension and permitted her attacker to return to school with a full athletic scholarship.

Virginia Tech took this action without notifying Brzonkala, although she had been informed of the university's actions in the case

19

at every previous juncture. This decision caused her to fear for her safety and to withdraw from college altogether. As punishment for his admitted rape Morrison received a "deferred suspension until [his] graduation from Virginia Tech" and "a one-hour educational session."

In short, Brzonkala alleges that Virginia Tech permitted, indeed fostered, an environment in which male student athletes could gang rape a female student without any significant punishment to the male attackers, nor any real assistance to the female victim. She alleges a legion of procedural irregularities in the hearing process, Virginia Tech's disregard for its own rules of finality, and its eventual decision to impose virtually no penalty for an admitted rape. These facts, if proven, would allow a jury to find that Virginia Tech's response to Brzonkala's gang rape was neither prompt nor adequate.

Virginia Tech argues that because it did levy some punishment against Morrison, its response was adequate. A defendant need not "make the most effective response possible" to sexual harassment. See Spicer v. Virginia Dept. of Corrections, 66 F.3d 705, 710 (4th Cir. 1995) (en banc). This does not mean, however, that any remedy, no matter how delayed or weak, will be adequate. Rather, we have consistently held under Title VII that a defendant employer is "liable for sexual harassment committed by its employees if no adequate remedial action is taken." Id. Similar reasoning applies in the Title IX context. In light of the seriousness of Brzonkala's allegations, the long and winding disciplinary process, and the proverbial slap on the wrist as punishment, we cannot conclude at this preliminary stage that Virginia Tech's remedy was either prompt or adequate.

For all of these reasons, Brzonkala has alleged sufficient facts to state a Title IX hostile environment claim against Virginia Tech.

B.

Brzonkala also alleges a Title IX disparate treatment claim, i.e., that Virginia Tech discriminated against her on the basis of sex during the disciplinary proceedings against Morrison and Crawford. In analyzing Brzonkala's claim, Title VII again "provide[s] a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX." Preston, 31 F.3d at 207.

20

Indeed, Virginia Tech does not even argue that Title VII principles are inapplicable in analyzing Title IX disparate treatment claims.

Proof of discriminatory intent is necessary to state a disparate treatment claim under Title VII. International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Absent some indication in the statute or regulations, Title IX similarly requires proof of discriminatory intent to state a disparate treatment claim. As such, we must examine Brzonkala's complaint to see if she has alleged sufficient facts to infer such intent. See Yusuf v. Vassar College, 35 F.3d 709, 715 (2d Cir. 1994).

In Yusuf, the Second Circuit dealt with allegations of a discriminatory school disciplinary hearing, and described the type of evidence a plaintiff must plead to establish the requisite intent:

> [A]llegations of a procedurally or otherwise flawed [school disciplinary] proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss. The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. Allegations of a causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases. . . . Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender. Of course, some allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias.

Yusuf, 35 F.3d at 715 (citations omitted). In this case Brzonkala has alleged a flawed proceeding and made a conclusory assertion that Virginia Tech discriminated in favor of male football players. But she

21

has not alleged any discriminatory statements or treatment by Virginia Tech, or any systematic mistreatment of women or rape victims.

Nevertheless, Brzonkala maintains that she has made sufficient allegations of Virginia Tech's discriminatory intent. First, she argues that Virginia Tech's policy of not automatically reporting rapes to the police shows a discriminatory intent. Brzonkala does not allege, however, that the university discouraged or hindered her (or other rape victims) from filing charges, or that the university generally treats rape less seriously in its own disciplinary proceedings. Nor does she state facts to support an inference that the university created its non-reporting policy to discriminate against rape victims. Without an allegation that Virginia Tech itself fails to punish rapists, or impedes criminal investigations, or separate facts to establish that the policy was a result of gender bias, the university has not discriminated against rape victims, because these victims can always pursue criminal charges themselves. In fact, because of the intensely personal nature of the crime, as well as the present day difficulties inherent in pursuing rape charges, a victim of rape may not always want to press charges or involve the police. See Brzonkala I , 935 F. Supp. at 777.

Next, Brzonkala relies upon allegations that her access to evidence, like that of the plaintiff in Yusuf, was hampered, as the factual basis for a finding of discriminatory intent. It is true that in Yusuf the plaintiff alleged numerous procedural difficulties. Yusuf, 35 F.3d at 712-13. But, in Yusuf the plaintiff also asserted that "males accused of sexual harassment at Vassar are `historically and systematically' and `invariably found guilty, regardless of the evidence, or lack thereof.'" Id. at 716. This sort of systematic discrimination, on top of the procedural irregularities, sufficed to state a claim of disparate treatment. Here we have nothing but "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination." Id. at 715. These allegations are "not sufficient to survive a motion to dismiss." Id.; cf. Houck v. Virginia Polytechnic Inst. & State Univ., 10 F.3d 204, 206-07 (4th Cir. 1993) ("[I]n the Title VII context, isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of

22

employees."); <u>Cook v. CSX Transp. Corp.</u>, 988 F.2d 507, 511-13 (4th Cir. 1993) (same).

Finally, Brzonkala contends that the woefully inadequate punishment meted out against Morrison is in and of itself proof of sex discrimination. Again, without more, this does not prove intentional gender discrimination against Brzonkala. In sum, the district court correctly dismissed Brzonkala's Title IX claim of disparate treatment.**7**

III.

We now turn to the question of whether the district court erred in dismissing Brzonkala's claim that Morrison and Crawford violated Title III of the Violence Against Women Act of 1994 ("VAWA"). <u>See</u> 42 U.S.C. § 13981 (1994). The district court held that Brzonkala alleged a valid VAWA claim, but that VAWA was beyond congressional authority, and thus unconstitutional. <u>See Brzonkala II</u>, 935 F. Supp. at 801. We agree with the district court that Brzonkala stated a claim under VAWA. We conclude, however, that Congress acted within its authority in enacting VAWA and hold that the district court erred in ruling the statute unconstitutional.

A.

In September 1994, after four years of hearings, Congress enacted VAWA, a comprehensive federal statute designed to address "the escalating problem of violent crime against women." S. Rep. No. 103-138, at 37 (1993). Title III, the portion of the statute at issue in this case, establishes the right upon which a civil claim can be brought:

_____

**7** Virginia Tech also argues that Brzonkala lacks standing to pursue injunctive relief in her Title IX claim because she has left school and does not plan to return. The record before us does not support Virginia Tech's claim that Brzonkala will never again attend Virginia Tech. All that the complaint alleges is that Brzonkala did not return to Virginia Tech in the Fall of 1995. Without a factual basis for believing that Brzonkala will not re-register at Virginia Tech, we will not dismiss for mootness her claims for injunctive relief.

23

> All persons within the United States shall have the right to be free from crimes of violence motivated by gender . . . .

42 U.S.C. § 13981(b).

The statute goes on to set forth the elements necessary to plead and prove such a claim:

> (c) Cause of action
>
> A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.
>
> (d) Definitions
>
> For purposes of this section--
>
> (1) the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender; and
>
> (2) the term "crime of violence" means--
>
> (A) an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in crimi-

24

nal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

   (B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken.

42 U.S.C. § 13981. Thus, to state a claim under § 13981(c) a plaintiff victim must allege "a crime of violence motivated by gender." 42 U.S.C. § 13981(c).

Morrison and Crawford do not argue that Brzonkala's allegation of gang rape fails to satisfy § 13981(d)(2)'s definition of a "crime of violence." However, they do briefly assert that Brzonkala has failed to allege a "crime of violence motivated by gender." 42 U.S.C. § 13981(c) (emphasis added).

A "crime of violence motivated by gender" is defined as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). Congress has indicated that "[p]roof of `gender motivation' under Title III" of VAWA is to "proceed in the same ways proof of race or sex discrimination proceeds under other civil rights laws. Judges and juries will determine `motivation' from the `totality of the circumstances' surrounding the event." S. Rep. No. 103-138, at 52; see also S. Rep. No. 102-197, at 50 (1991).

The statute does not outlaw "[r]andom acts of violence unrelated to gender." 42 U.S.C. § 13981(e)(1). However, bias "can be proven by circumstantial as well as indirect evidence." S. Rep. No. 103-138, at 52. "Generally accepted guidelines for identifying hate crimes may also be useful" in determining whether a crime is gender-motivated, such as: "language used by the perpetrator; the severity of the attack (including mutilation); the lack of provocation; previous history of

25

similar incidents; absence of any other apparent motive (battery without robbery, for example); common sense." Id. at 52 n.61.

With these standards in mind, we examine Brzonkala's complaint. Brzonkala alleges that two virtual strangers, Morrison and Crawford, brutally raped her three times within minutes after first meeting her. Although Brzonkala does not allege mutilation or other severe injury, the brutal and unprotected gang rape itself constitutes an attack of significant "severity." Id. Moreover, Brzonkala alleges that the rapes were completely without "provocation." Id. One of her assailants conceded during the college disciplinary hearing that Brzonkala twice told him, "No" before he initially raped her. Further, there is an absence of any "apparent motive" for the rapes other than gender bias. Id. For example, no robbery or other theft accompanied the rapes.

Finally, Brzonkala alleges that when Morrison had finished raping her for the second time he told her, "You better not have any fucking diseases." She also alleges that Morrison later announced to the college dining room, "I like to get girls drunk and fuck the shit out of them." Verbal expression of bias by an attacker is certainly not mandatory to prove gender bias, Brzonkala II, 935 F. Supp. at 785 ("The purpose of the statute would be eviscerated if, to state a claim, a plaintiff had to allege, for example, that the defendant raped her and stated, `I hate women.'"), but it is "helpful." See S. Rep. No. 103-138, at 51. As the district court noted, Morrison's "statement reflects that he has a history of taking pleasure from having intercourse with women without their sober consent" and that "[t]his statement indicates disrespect for women in general and connects this gender disrespect to sexual intercourse." Brzonkala II , 935 F. Supp. at 785. In addition, since Brzonkala alleged that Morrison and Crawford engaged in a conspiracy to rape her, Morrison's comments are also relevant in assessing Crawford's liability. See Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 103 (3rd Cir. 1993) (concluding that in a civil conspiracy "every conspirator is jointly and severally liable for all acts of co-conspirators taken in furtherance of the conspiracy"); United States v. Carpenter, 961 F.2d 824, 828 n.3 (9th Cir. 1992) (holding that "acts and statements in furtherance of the conspiracy may be attributed to" a co-conspirator and citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)); United States v. Chorman, 910 F.2d 102, 111 (4th Cir. 1990) (same).

26

In sum, Brzonkala has clearly alleged violations of VAWA. Virtually all of the earmarks of "hate crimes" are asserted here: an unprovoked, severe attack, triggered by no other motive, and accompanied by language clearly stating bias. The district court correctly concluded that Brzonkala alleged a VAWA claim.

B.

The remaining issue before us is whether the district court correctly held that Congress exceeded its constitutional authority in enacting VAWA. Congress itself directly addressed this question. On the basis of numerous specific findings and a mountain of evidence, Congress stated that it was invoking its authority "[p]ursuant to . . . section 8 of Article I of the Constitution" to enact a new civil rights law to protect "victims of gender motivated violence and to promote public safety, health, and activities affecting interstate commerce . . . ." 42 U.S.C. § 13981(a) (emphasis added).**8** Article I, Section 8, Clause 3 of the Constitution empowers Congress to "regulate Commerce . . . among the several states." U.S. Const. art. I,§ 8, cl. 3.

In assessing whether Congress exceeded its authority under the Commerce Clause, we note that every act of Congress is entitled to a "strong presumption of validity and constitutionality," Barwick v. Celotex Corp., 736 F.2d 946, 955 (4th Cir. 1984), and will be invalidated only "for the most compelling constitutional reasons." Mistretta v. United States, 488 U.S. 361, 384 (1989). The Supreme Court has directed that "[g]iven the deference due`the duly enacted and carefully considered decision of a coequal and representative branch of our Government,'" a court is "not lightly[to] second-guess such legislative judgments." Westside Comm. Bd. of Educ. v. Mergens, 496 U.S. 226, 251 (1990) (quoting Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 319 (1985)). This is"particularly" true when, as here, the legislative "judgments are based in part on empiri-

_____

**8** Congress also expressly stated that Section 5 of the Fourteenth Amendment authorized enactment of VAWA. See 42 U.S.C. § 13981(a). In view of our holding that VAWA is a valid exercise of Congress' power under the Commerce Clause, we need not reach the question of whether the Fourteenth Amendment also provided authorization for VAWA.

27

cal determinations." Id. Deference to such judgments by the legislature constitutes the "paradigm of judicial restraint." FCC v. Beach Communications, Inc., 508 U.S. 307, 314 (1993).

Moreover, "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow." Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276 (1981); see also United States v. Lopez, 514 U.S. 549, 568 (1995) (Kennedy, J., concurring) ("The history of the judicial struggle to interpret the Commerce Clause . . . counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power."). Thus, a reviewing court need only determine "whether a rational basis existed for concluding that a regulated activity" substantially affects interstate commerce. Lopez, 514 U.S. at 557.

With these directives in mind, we consider whether Congress exceeded its authority under the Commerce Clause in passing VAWA. The Supreme Court has long held, and recently reiterated in Lopez, that there are "three broad categories of activity that Congress may regulate" under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . . Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce . . . i.e., those activities that substantially affect interstate commerce.

Lopez, 514 U.S. at 558-559 (citations omitted); United States v. Bailey, 112 F.3d 758, 765-66 (4th Cir. 1997), cert. denied, 118 S. Ct. 240 (1997) (rejecting a Lopez challenge to Title II of VAWA and stating Lopez's three-part test).

Here, as in Lopez, "[t]he first two categories of authority may be quickly disposed of:" VAWA "is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the

28

interstate transportation of a commodity through the channels of commerce; nor can [VAWA] be justified as a regulation [protecting] an instrumentality of interstate commerce or a thing in interstate commerce." Lopez, 514 U.S. at 557. "Thus, if [VAWA] is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce." Id.

The Lopez Court applied the substantial effects test to the Gun Free School Zones Act, which made it a federal crime to knowingly possess a firearm in a school zone. 18 U.S.C. § 922(q) (1988 ed. Supp. V) (amended 1994, 1996). In passing § 922(q), Congress attempted to supplant state criminal laws with a federal statute that criminalized an activity that on its face had "nothing to do with" commerce, without making any findings demonstrating the activity affected interstate commerce or including a jurisdictional element ensuring a case by case connection with interstate commerce. Lopez , 514 U.S. at 561 and n.3. In these circumstances, the Supreme Court "would have [had] to pile inference upon inference" to find a rational basis for concluding the statute "substantially affect[ed] any sort of interstate commerce." Id. at 567. This the Court declined to do, and so declared § 922(q) unconstitutional. Id.

In contrast to the congressional silence in Lopez, Congress made voluminous findings when it enacted VAWA. Accordingly, we can begin where the Lopez Court could not, by"evaluat[ing] the legislative judgment that the activity in question substantially affected interstate commerce." Lopez, 514 U.S. at 563; see also City of Boerne v. Flores, 117 S. Ct. 2157, 2169-2170 (1997) (recognizing the importance of Congressional findings in determining the"appropriateness of [Congress's] remedial measures"). In doing so, we recognize that discerning a rational basis "is ultimately a judicial rather than a legislative question," Lopez, 514 U.S. at 557 n.2 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273 (1964) (Black, J., concurring)), and "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." Id. (quoting Hodel, 452 U.S. at 311 (Rehnquist, J., concurring)). But a "court must defer" to congressional findings when there is "a rational basis for such a finding." Hodel, 452 U.S. at 276. Indeed, "[t]he Supreme Court has without fail given effect to such congressional findings." Laurence H. Tribe, American

29

Constitutional Law, 310-11 (2d ed. 1988). Accordingly, we first examine the congressional findings made in connection with VAWA. See United States v. Leshuk, 65 F.3d 1105, 1111-12 (4th Cir. 1995) (rejecting a Lopez challenge to the "Comprehensive Drug Abuse Prevention and Control Act" and beginning and ending our analysis by relying totally upon Congress's "detailed findings" on the interstate commerce effects).

1.

The Congressional findings and testimony that support the passage of VAWA pursuant to the Commerce Clause are detailed and extensive.[9] Congress carefully documented the enormity of the problem caused by violence against women. For example, Congress found that:

> * "Violence is the leading cause of injury to women ages 15-44 . . . ." S. Rep. No. 103-138, at 38 (1993).

> * "[F]or the past 4 years [prior to 1993], the U.S. Surgeons General have warned that family violence -- not heart attacks or cancer or strokes -- poses the single largest threat of injury to adult women in this country." Id. at 41-42 (footnote omitted).

> * "An estimated 4 million American women are battered each year by their husbands or partners. Approximately 95% of all domestic violence victims are women." H.R. Rep. No. 103-395, at 26 (1993) (footnotes omitted).

> * "Three out of four American women will be victims of

_____

[9] Most of Congress's copious findings do not appear in the statute itself, but in applying rational basis review courts also consider congressional committee findings. See Lopez, 519 U.S. at 562; Preseault v. ICC, 494 U.S. 1, 17 (1990) (citing House Report in discussion of congressional findings regarding effect on interstate commerce of federal "rails-to-trails" statute); Hodel, 452 U.S. at 277-80 (relying on committee reports to uphold Congress's power to enact the Surface Mining Act); Hoffman v. Hunt, No. 96-1581, 1997 WL 578787 at *10 (4th Cir. Sept. 19, 1997) (relying upon a House Report to uphold FACE).

> violent crimes sometime during their life." Id. at 25 (footnote omitted).
>
> * "Since 1988, the rate of incidence of rape has risen four and a half times as fast as the total crime rate. There were 109,062 reported rapes in the United States in 1992 -- one every five minutes. The actual number of rapes committed is approximately double that figure . . . ." Id. (footnotes omitted).

The committee reports similarly found that "the cost to society" resulting from violence against women "is staggering." S. Rep. No. 101-545, at 33 (1990). Domestic violence alone is estimated to cost employers "at least $3 billion -- not million, but billion -- dollars a year" due to absenteeism in the workplace. Id. Furthermore, "estimates suggest that we spend $5 to $10 billion a year on health care, criminal justice, and other social costs of domestic violence." S. Rep. No. 103-138, at 41. Moreover, "[i]t is not a simple matter of adding up the medical costs, or law enforcement costs, but of adding up all of those expenses plus the costs of lost careers, decreased productivity, foregone educational opportunities, and long-term health problems." S. Rep. No. 101-545, at 33.

These monetary figures were accompanied by other evidence establishing that violence against women has a substantial impact on interstate commerce:

> Over 1 million women in the United States seek medical assistance each year for injuries sustained by their husbands or other partners. As many as 20 percent of hospital emergency room cases are related to wife battering.
>
> But the costs do not end there: woman abuse "has a devastating social and economic effect on the family and the community." . . . It takes its toll in homelessness: one study reports that as many as 50 percent of homeless women and children are fleeing domestic violence. It takes its toll in employee absenteeism and sick time for women who either cannot leave their homes or are afraid to show the physical effects of the violence.

31

S. Rep. No. 101-545, at 37. Fear of violence "takes a substantial toll on the lives of all women, in lost work, social, and even leisure opportunities." S. Rep. No. 102-197, at 38 (1991).

Thus, based upon an exhaustive and meticulous investigation of the problem, Congress found that:

> crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved, in interstate commerce. . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

H.R. Conf. Rep. No. 103-711, at 385 (1994), reprinted in 1994 U.S.C.C.A.N. 1839, 1853.**10**

In concluding that "[t]here is no doubt that Congress has the power to create the Title III remedy under" the Commerce Clause, Congress noted that:

> [g]ender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities,

_____

**10** House Conference Report 103-711, containing the express finding that "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce," was drafted by the House and Senate Conference Committees on VAWA, and was passed along with VAWA by the House on August 21, 1994 and by the Senate on August 24, 1994. See Violence Against Women § 5:42 (David Frazee et al. eds., 1997). Indeed, the findings in Report 103-711 were part of the original text of VAWA and were removed to the conference report only to avoid cluttering the U.S. Code with "`congressional findings' that had no force of law." Id. § 5:40. VAWA, of course, was enacted before Lopez, when the necessity of expressly finding that regulated activity had a "substantial effect" upon commerce (rather than just an "effect") was not altogether clear. Thus, it is particularly telling that in passing VAWA Congress found that gender-based violence against women does"substantially affect" interstate commerce.

increases health expenditures, and reduces consumer spend-
ing, all of which affect interstate commerce and the national
economy. Gender-based violence bars its most likely targets
-- women -- from full participation in the national econ-
omy. For example, studies report that almost 50 percent of
rape victims lose their jobs or are forced to quit in the after-
math of the crime. Even the fear of gender-based violence
affects the economy because it deters women from taking
jobs in certain areas or at certain hours that pose a signifi-
cant risk of such violence. . . . For example, women often
refuse higher paying night jobs in service/retail industries
because of the fear of attack. Those fears are justified: the
No. 1 reason why women die on the job is homicide and the
highest concentration of those women is in service/retail
industries. . . . 42 percent of deaths on the job of women are
homicides; only 12 percent of the deaths of men on the job
are homicides.

S. Rep. No. 103-138, at 54 & n.70 (footnotes omitted).

Our task is simply to discern whether Congress had "a rational
basis" for concluding that the regulated activity-- here violence
against women -- substantially "affected interstate commerce."
Lopez, 519 U.S. at 558-559.[11] After four years of hearings and consid-

_____

[11] We and the ten other circuits to consider the matter have all applied
the rational basis test to post-Lopez Commerce Clause challenges. See
Hoffman, 1997 WL 578787 at *7-*11 (stating and applying rational basis
test); United States v. Knutson, 113 F.3d 27, 29 (5th Cir. 1997) (same);
United States v. Parker, 108 F.3d 28, 30 (3rd Cir. 1997), cert. denied,
118 S. Ct. 111 (1997) (same); United States v. Olin Corp., 107 F.3d
1506, 1509 (11th Cir. 1997) (same); United States v. Bramble, 103 F.3d
1475, 1482 (9th Cir. 1996) (same); Terry v. Reno , 101 F.3d 1412, 1416
(D.C. Cir. 1996), cert. denied, 117 S. Ct. 2431 (1997) (same); Proyect
v. United States, 101 F.3d 11, 12 (2d Cir. 1996) (same); United States
v. McHenry, 97 F.3d 125, 128 (6th Cir. 1996), cert. denied, 117 S. Ct.
992 (1997) (same); United States v. Hampshire , 95 F.3d 999, 1001 (10th
Cir. 1996), cert. denied, 117 S. Ct. 753 (1997) (same); United States v.
Kenney, 91 F.3d 884, 889 (7th Cir. 1996) (same); United States v.
Dinwiddie, 76 F.3d 913, 920 (8th Cir. 1996), cert. denied, 117 S. Ct. 613
(1996) (same).

eration of voluminous testimonial, statistical, and documentary evidence, Congress made an unequivocal and persuasive finding that violence against women substantially affects interstate commerce. Even the district court recognized that "[a] reasonable inference from the congressional findings is that violence against women has a major effect on the national economy." Brzonkala II , 935 F. Supp. at 792. Accordingly, whatever one's doubts as to whether Title III of VAWA represents a good policy decision, Seaton v. Seaton, 971 F. Supp. 118 (E.D. Tenn. 1997), we can only conclude that Congress' findings are grounded in a rational basis. We note that every court to consider the question except the court below, has so held. See Crisonino v. New York City Housing Auth., No. 96 Civ. 9742 (HB) (S.D.N.Y. Nov. 18, 1997); Asimov v. Lake, No. 976263, 1997 WL 538718 (M.D. Ill. Aug. 27, 1997); Seaton, 971 F. Supp. at 1194; Doe v. Hartz, 970 F. Supp. 1375 (N.D. Iowa 1997); Doe v. Doe, 929 F. Supp. 608 (D. Conn. 1996).

In fact, in United States v. Leshuk, 65 F.3d 1105 (4th Cir. 1995), we recently relied exclusively on less extensive Congressional findings to uphold Section 401(a)(1) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 841(a)(1) (1994). Id. at 1111, 1112. In Leshuk the defendant was convicted of possessing and cultivating marijuana in violation of § 841(a)(1), and raised a Lopez challenge to the statute. Id. at 1107-08. We held that Lopez did not require the invalidation of § 841(a)(1) because the "intrastate drug activities" that it regulated "are clearly tied to interstate commerce." 65 F.3d at 1112. We based our conclusion wholly on Congress's "detailed findings that intrastate manufacture, distribution, and possession of controlled substances, as a class of activities, have a substantial and direct effect upon interstate drug trafficking and that effective control of the interstate problems requires the regulation of both intrastate and interstate activities." Id. (internal quotation marks omitted). Without further ado we "relied upon these findings" to hold the Commerce Clause authorized Congress to enact this statute. Id.

Similarly, earlier this year, in Hoffman v. Hunt  we reviewed "the congressional reports" to uphold the Freedom of Access to Clinics Act (FACE), determining that those reports made "clear" that "several aspects of interstate commerce are directly and substantially affected by the regulated conduct." No. 96-1591, 1997 WL 578787 at *11 (4th

34

Cir., Sept. 19, 1997). Because Congress had made these persuasive findings we concluded that we did not need to "`pile inference upon inference' to find a substantial effect on interstate commerce." Id. (quoting Lopez, 514 U.S. at 567). The congressional findings setting forth VAWA's substantial effect on interstate commerce are far more detailed and complete than those we found sufficient to establish a rational basis for the statutes challenged in Leshuk and Hoffman, and we thus have no hesitation similarly upholding VAWA. When a court finds "that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, [its] investigation is at an end." United States v. Beuckelaere, 91 F.3d 781, 785 (6th Cir. 1996) (quoting Katzenbach v. McClung, 379 U.S. 294, 303 (1964)).**12**

2.

Contrary to the district court's holding, and the arguments of Morrison and Crawford, nothing in Lopez requires a different result.

In noting that § 922(q) "plow[ed] thoroughly new ground and represent[ed] a sharp break with the longstanding pattern of federal firearms legislation," Lopez, 519 U.S. at 563, the Lopez Court clearly indicated that in finding this statute unconstitutional it was enunciating a "limited holding." Id. at 568 (Kennedy, J., concurring).

_____

**12** Indeed, post-Lopez, numerous courts have reiterated that such deference to congressional findings is required; "court[s] must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." Terry, 101 F.3d at 1416; Proyect, 101 F.3d at 12-13 (same); United States v. McKinney, 98 F.3d 974, 979 (7th Cir. 1996) (same), cert. denied , 117 S. Ct. 1119 (1997); Hampshire, 95 F.3d at 1004 (same); United States v. Kim, 94 F.3d 1247, 1250 (9th Cir. 1996) (same); United States v. Bishop, 66 F.3d 569, 577 (3d Cir. 1995), cert. denied, 116 S. Ct. 1444 (1996) (same); Cheffer v. Reno, 55 F.3d 1517, 1520-21 (11th Cir. 1995) (same); see also Knutson, 113 F.3d at 29-31 (upholding 18 U.S.C. § 922(o) solely on the basis of "congressional findings" and noting that Lopez "made clear that federal Commerce Clause legislation continues to merit a high degree of judicial deference"); United States v. Monteleone, 77 F.3d 1086, 1091-92 (8th Cir. 1996) (upholding 18 U.S.C. § 922(d) on the basis of "explicit Congressional findings").

Although the Court refused to make an "additional expansion" to Congress's Commerce power to uphold § 922(q), and clarified that a regulated activity must "substantially affect interstate commerce," it did not overrule a single Commerce Clause precedent, signal a decrease in congressional power under the Commerce Clause, or abandon the "rational basis" test. Id. at 1629-34; see also United States v. Wright, 117 F.3d 1265, 1269 (11th Cir. 1997) ("Lopez did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority."); United States v. Wilson, 73 F.3d 675, 685 (7th Cir. 1995) (The Lopez Court "reaffirmed rather than overturned the previous half century of Commerce Clause precedent"), cert. denied, 117 S. Ct. 46-47 (1996).

In fact, in describing the history of the Court's Commerce Clause jurisprudence, Lopez forthrightly affirmed the modern expansive view of Congress's power under the Commerce Clause, and eschewed the more restrictive view of "commerce" based on formalistic distinctions between "direct" and "indirect" effects on interstate commerce. Id. at 555. The Court noted that "modern-era precedents . . . confirm that this power is subject to outer limits," i.e. it cannot "be extended so as to embrace effects upon interstate commerce so indirect and remote" as to "obliterate the distinction between what is national and what is local and create a completely centralized government." Id. at 1628-29. But the Court expressly followed decades of "modern-era precedents" recognizing that a court's only role in considering a Commerce Clause challenge is "to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce." Id. at 557 (citing Hodel , 452 U.S. at 276-80; Perez v. United States, 402 U.S. 146, 155-56 (1971)); Katzenbach v. McClung, 379 U.S. 294, 299-301 (1964); and Heart of Atlanta Motel, 379 U.S. at 252-253); see also Lopez, 519 U.S. at 374 (Kennedy, J., concurring) (Lopez does not "call in question" prior commerce clause "principles").**13**

_____

**13** Thus, it is unsurprising that"courts have resisted urgings to extend Lopez beyond § 922(q)." United States v. Wall, 92 F.3d 1444, 1448 (6th Cir. 1996), cert. denied, 117 S. Ct. 690 (1997) (upholding 18 U.S.C. § 1955, which prohibits inter alia intrastate illegal gambling activities). Indeed, post-Lopez innumerable federal statutes have been challenged on Commerce Clause grounds but not a single one has been invalidated by

Morrison and Crawford's reliance on <u>Lopez</u> falters not only because they ignore the limited nature of the <u>Lopez</u> holding but also because VAWA differs from § 922(q) in several important respects. In order to uphold VAWA, we need not "pile inference upon inference" as the Government asked the Court to do in <u>Lopez</u>. <u>Lopez</u>, 519 U.S. at 567. Because Congress made no findings to support § 922(q) the Government was forced to argue that guns in schools affected commerce based upon several tenuous, multi-layered theories. <u>See id.</u> at 564; <u>Terry</u>, 101 F.3d at 1418 (quoting <u>Lopez</u>, 519 U.S. at 564) (For

_____

a federal appellate court. <u>See</u>, <u>e.g.</u>, <u>Hoffman</u>, 1997 WL 578787 *5-*11 (upholding 18 U.S.C. § 248, which prohibits interference with access to reproductive health clinics); <u>United States v. Soderna</u>, 82 F.3d 1370, 1373-74 (7th Cir.), <u>cert. denied</u>, 117 S.Ct. 507 (1996) (same); <u>Dinwiddie</u>, 76 F.3d at 919-21 (same); <u>Terry</u>, 101 F.3d at 1415-18 (same); <u>Wilson</u>, 73 F.3d at 679-88 (same); <u>Cheffer</u>, 55 F.3d at 1519-21 (same); <u>Wright</u>, 117 F.3d at 1268-1271 (upholding 18 U.S.C. § 922(o), which prohibits intrastate possession of machine gun, and noting that every circuit to consider the question had so held); <u>United States v. Crump</u>, 120 F.3d 462, 465-66 (4th Cir. 1997) (upholding 18 U.S.C.A. § 924(c)(1), which prohibits use and carrying of a firearm during and in relation to a drug trafficking crime, and noting "all of the circuits that have considered the question" had upheld the statute in the face of a <u>Lopez</u> challenge); <u>Olin Corp.</u>, 107 F.3d at 1509-10 (upholding CERCLA, 42 U.S.C. §§ 9601-9675); <u>United States v. Allen</u>, 106 F.3d 695, 700-1 (6th Cir. 1997), <u>cert. denied</u>, (1997) (upholding 21 U.S.C. § 860(a), the Drug Free School-Zones Act); <u>United States v. Hawkins</u>, 104 F.3d 437, 439-40 (D.C. Cir. 1997), <u>cert. denied</u>, 118 S. Ct. 126 (1997) (same); <u>United States v. Wells</u>, 98 F.3d 808, 810-11 (4th Cir. 1996) (upholding 18 U.S.C. § 922(g), which prohibits possession of a firearm by a felon, and noting ten other circuits that had upheld its constitutionality under <u>Lopez</u>); <u>United States v. Genao</u>, 79 F.3d 1333, 1335-37 (2d Cir. 1996) (same); <u>United States v. Tisor</u>, 96 F.3d 370, 373-75 (9th Cir. 1996), <u>cert. denied</u>, 117 S.Ct. 1012 (1997) (upholding congressional authority to prohibit intrastate possession or sale of narcotics); <u>Leshuk</u>, 65 F.3d at 1111-12 (same); <u>Bramble</u>, 103 F.3d at 1479-82 (upholding the Eagle Protection Act, 16 U.S.C. § 668); <u>United States v. Michael R.</u>, 90 F.3d 340, 343-45 (9th Cir. 1996) (upholding 18 U.S.C. § 922(x)(2), which prohibits juvenile possession of a handgun); <u>United States v. Lomayaoma</u>, 86 F.3d 142, 144-46 (9th Cir.), <u>cert. denied</u>, 117 S. Ct. 272 (1996) (upholding the Indian Major Crimes Act, 18 U.S.C. § 1153).

37

example, "gun possession near schools threatens the educational environment, which hampers the educational process, which creates a `less productive citizenry' which adversely affects `the Nation's economic well-being' and which in the end adversely affects interstate commerce."). VAWA, by contrast, regulates behavior -- gender-based violent crime against women -- which Congress has found substantially and gravely affects interstate commerce on the basis of abundant evidence. Cf. Perez, 402 U.S. at 154 (rejecting Commerce Clause challenge because "credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce"). To connect VAWA with interstate commerce, a court need not make any inferences -- Congress itself has clearly established and documented that gender based violence against women substantially affects interstate commerce.

Additionally, unlike § 922(q), VAWA does not invade areas of traditional state control. The Lopez Court noted that "[u]nder our federal system, the `States possess primary authority for defining and enforcing the criminal law.' . . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a `change in the sensitive relation between federal and state criminal jurisdiction.'" Lopez, 519 U.S. at 561 (quoting Brecht v. Abramson, 507 U.S. 619, 635 (1993), and United States v. Enmons, 410 U.S. 396, 411-12 (1973)). Title III of VAWA is not a criminal statute and it displaces no state criminal law. Cf. id. (noting that statute in Lopez "displace[s] state policy choices" and "overrides legitimate state . . . laws"). Nothing in Title III prevents a victim of gender-based violence from bringing state criminal charges or pursuing state tort remedies, or affects how the state treats those claims.

In fact, far from displacing state law, Congress carefully designed VAWA to harmonize with state law and protect areas of state concern. Thus, VAWA references state criminal laws in defining a "crime of violence." See 42 U.S.C.§ 13981(d)(2) (defining "crime of violence" as "an act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that would come within the meaning of State or Federal offenses described in section 16 of Title 18 . . . .") (emphasis added). Moreover, Congress expressly limited the reach of VAWA in further defer-

38

ence to traditional areas of state expertise such as divorce or child custody proceedings. See 42 U.S.C. § 13981(e)(4) (VAWA does not confer "jurisdiction over any State law claim seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree."). In sum, VAWA acts to supplement, rather than supplant, state criminal, civil, and family law controlling gender violence. The States are still free to "experiment[ ] to devise various solutions" to the problems of gender-based violence against women. Lopez, 519 U.S. at 581 (Kennedy, J., concurring).**14**

In addition, unlike the statute invalidated in Lopez, VAWA does not occupy a legal territory where "States lay claim by right of history and expertise." Id. at 1641 (Kennedy, J., concurring). Instead, VAWA legislates in an area -- civil rights -- that has been a federal responsibility since shortly after the Civil War. Furthermore, federal action is particularly appropriate when, as here, there is persuasive evidence that the States have not successfully protected the rights of a class of citizens. In passing VAWA Congress made extensive and convincing findings that state law had failed to successfully address gender-motivated violence against women. Congress concluded that:

> Other State remedies have proven inadequate to protect women against violent crimes motivated by gender animus. Women often face barriers of law, of practice, and of prejudice not suffered by other victims of discrimination. Traditional State law sources of protection have proved to be difficult avenues of redress for some of the most serious crimes against women. Study after study has concluded that crimes disproportionately affecting women are often treated less seriously than crimes affecting men. [C]ollectively, these reports provide overwhelming evidence that gender

_____

**14** In fact, State Attorneys General from forty-one states supported the passage of VAWA. They told Congress: "Our experience as attorneys general strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." See Crimes of Violence Motivated by Gender: Hearing Before the Subcomm. on Civil and Constitutional Rights of the Senate Comm. on the Judiciary, 103d Cong. 34-36 (1993) (Letter from State Attorneys General).

bias permeates the court system and that women are most often its victims.

S. Rep. No. 103-138, at 49 (footnotes omitted). **15** In VAWA, Congress has passed a civil rights law, a quintessential area of federal expertise, in response to "existing bias and discrimination in the criminal justice system." H.R. Conf. Rep. No. 103-711, at 385 (1994), reprinted in 1994 U.S.C.C.A.N. 1839, 1853.

Nonetheless, Morrison and Crawford argue that Lopez requires a different result. They note that § 922(q) had"nothing to do with `commerce'" and was not "an essential part of a larger regulation of economic activity," Lopez, 519 U.S. at 561, and assert that VAWA similarly regulates a non-economic activity and is therefore beyond Congress's Commerce Clause authority. This argument, however, misreads both Lopez and VAWA.

_____

**15** The studies referred to in the above quotation were largely State-sponsored, including the following: Administrative Office of the California Courts Judicial Counsel, Achieving Equal Justice for Women and Men in the Courts (1990); Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender & Justice in the Colorado Courts (1990); Connecticut Task Force on Gender Justice and the Courts (1991); Florida Supreme Court Gender Bias Study Commission, Report (1990); Supreme Court of Georgia, Gender and Justice in the Courts (1991); Illinois Task Force, Gender Bias in the Courts (1990); Maryland Special Joint Committee, Gender Bias in the Courts (1989); Massachusetts Supreme Judicial Court, Gender Bias Study of the Court System in Massachusetts (1989); Michigan Supreme Court Task Force on Gender Issues in the Courts, Final Report (1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, Final Report (1989); Nevada Supreme Court Gender Bias Task Force, Justice For Women (1989); New Jersey Supreme Court Task Force, Women in the Courts (1984); New York Task Force on Women in the Courts, Report (1986); Rhode Island Supreme Court Committee on Women in the Courts (1987); Utah Task Force on Gender and Justice, Report to the Utah Judicial Council (1990); Vermont Supreme Court and Vermont Bar Association, Gender and Justice: Report of the Vermont Task Force on Gender Bias in the Legal System (1991); Washington State Task Force, Gender and Justice in the Courts (1989); Wisconsin Equal Justice Task Force, Final Report (1991). See S. Rep. No. 103-138, at 49 n.52.

First, as Morrison and Crawford concede, Lopez  clearly does not
hold that a statute must regulate economic activity to pass muster
under the Commerce Clause. Such a holding could not be squared
with past Commerce Clause jurisprudence, or Lopez itself. Lopez
quoted Wickard v. Filburn's famous statement that "[e]ven if appel-
lee's activity be local and though it may not be regarded as
commerce, it may still, whatever its nature, be reached by Congress
if it exerts a substantial economic effect on interstate commerce."
Wickard v. Filburn, 317 U.S. 111, 125 (1942) (emphasis added),
quoted in Lopez, 519 U.S. at 556. Similarly, the Lopez Court relied
on Heart of Atlanta Motel, 379 U.S. 241 and Katzenbach, 379 U.S.
at 294. See Lopez, 519 U.S. at 557-563. These cases involved the pub-
lic accommodation provisions of the Civil Rights Act of 1964, 78
Stat. 243 (codified as amended at 42 U.S.C. § 2000a (1994)), not an
"economic" regulation but a civil rights statute, which like VAWA
prohibits acts motivated by bias that have a substantial effect on inter-
state commerce.**16**

Furthermore, the actual basis of the Lopez holding, which Morrison
and Crawford attempt to ignore, undermines their argument as to the

_____

**16** Thus, we follow our sister circuits and hold that Lopez does not nar-
row Congress's Commerce Clause authority solely"to the regulation of
commercial actors, and not private individuals who interfere with com-
mercial activities in interstate commerce. To the contrary, the Court . . .
[has upheld] statutes which penalize behavior substantially affecting
interstate commerce without regard to the actor's commercial or private
status." Cheffer, 55 F.3d at 1520 n.6; see also Knutson, 113 F.3d at 30
(same); United States v. Hicks, 106 F.3d 187, 189 (7th Cir. 1997), cert.
denied, 117 S. Ct. 2425 (1997) (same); Dinwiddie, 76 F.3d at 920-21
(same); Terry, 101 F.3d at 1417 (same); Wilson, 73 F.3d at 684-85
(same). As Chief Judge Posner recently noted, the fact that a law was not
explicitly meant "to increase the gross national product by removing a
barrier to free trade, but rather to protect personal safety and property
rights, is irrelevant [because] . . . Congress can regulate interstate com-
merce for any lawful motive." Soderna, 82 F.3d at 1374 (citing Heart of
Atlanta Motel, 379 U.S. at 256-57). The Supreme Court itself has recog-
nized, "[a]n enterprise surely can have a detrimental influence on inter-
state or foreign commerce without having its own profit-seeking
motives." National Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 258
(1994).

41

importance of "economic activity." The Lopez Court did not strike down § 922(q) because it regulated non-economic activity. The Court invalidated § 922(q) because neither Congress nor the Government convinced the Court that there was a rational basis for concluding that possession of a gun in a school zone substantially affected interstate commerce. Lopez 115 S. Ct. at 1631-33. Here, however, there clearly is a rational basis for concluding that gender-based violence against women does precisely this.

Even if the regulated activity itself had to have an economic nexus, VAWA, unlike § 922(q), regulates an activity that is "an essential part of a larger regulation of economic activity." Lopez, 115 S. Ct. at 1631. As recounted above, Congress recognized the enormous impact that violence against women has on women in the workplace, and as such, VAWA, along with Title VII, can be seen as a part of a larger regulatory effort to eliminate gender-based violence as a barrier to job opportunities. Congress found that "current law provides a civil rights remedy for gender crimes committed in the workplace, but not for crimes of violence motivated by gender committed on the street or in the home." H.R. Conf. Rep. No. 103-711, at 385 (1994), reprinted in 1994 U.S.C.C.A.N. 1839, 1853. VAWA was meant to fill that gap.

Morrison and Crawford's reliance on the fact that VAWA, like § 922(q), does not have a jurisdictional restriction is unpersuasive for similar reasons. Lopez does not require that a statute contain a jurisdictional limit in order to pass Commerce Clause scrutiny. See Olin Corp., 107 F.3d at 1510; United States v. Rybar, 103 F.3d 273, 285 (3rd Cir. 1996), cert. denied, 118 S. Ct. 46 (1997); Terry, 101 F.3d at 1418; Wall, 92 F.3d at 1449 n.11; Wilson, 73 F.3d at 685. "If a jurisdictional element were critical to a statute's constitutionality, the Court in Lopez would not have gone on to examine the Government's proffered rationales for the constitutionality of the gun possession statute." Terry, 101 F.3d at 1418.

The core teaching of Lopez is simply that Congress must ensure that legislation enacted pursuant to its Commerce Clause authority reaches only activities that "substantially affect interstate commerce." A jurisdictional element or Congressional findings assist a court in determining whether a regulated activity substantially affects interstate commerce. But neither is necessary for constitutional validity. See Wright, 117 F.3d at 1269 (Congress need not "place a jurisdic-

42

tional element" in a statute or make "legislative findings connecting the regulated activity to interstate commerce."). Although Congressional findings are not required, here we do have abundant legislative findings evidencing that Congress did indeed ensure that the regulated activity substantially affected interstate commerce. As noted above, we recently relied on far less detailed Congressional findings to uphold a statute that did not regulate economic activities and had no jurisdictional element. Leshuk, 65 F.3d at 1111-12.

Finally, our holding that Congress had a rational basis to conclude that violence against women has a substantial effect on interstate commerce does not mean, as Morrison and Crawford contend, that acting pursuant to the Commerce Clause Congress can reach any activity, including divorces, child-support, and"diet and exercise habits." This argument ignores the years of hearings on the need for VAWA and the reams of congressional findings made in support of VAWA. It belittles the seriousness of the national problem that discriminatory violence against women presents. It overlooks VAWA's explicit deference to State expertise: the statute's express restriction to gender-motivated violent crimes is defined in part in reference to state law, and it prohibits jurisdiction over divorce, alimony, and child custody matters. See 42 U.S.C. § 13981(e)(4).

Most importantly, this argument disregards the ineludible fact that our role is simply to determine if Congress had a rational basis for concluding that a regulated activity "substantially affect[s] interstate commerce." Lopez, 519 U.S. at 560. After four years of hearings and extensive legislative findings, Congress has adjudged that violence against women substantially affects interstate commerce. It is "abundantly clear that our job in this case is not to second-guess the legislative judgment of Congress that" violence against women "substantially affects interstate commerce, but rather to ensure that Congress had a rational basis for that conclusion." Bishop, 66 at 577. In light of Congress' findings, well supported by testimony and data, we hold that Congress had such a rational basis in enacting VAWA.

We note that it is apparent that Congress took great care to detail its findings and support its conclusion that VAWA was within its commerce authority. The breadth of the record itself manifests that Congress understood its duty to act only within its enumerated powers in this case, and took that duty seriously. As the Supreme Court

43

explained in Polish Nat'l Alliance v. NLRB, 322 U.S. 643, 650 (1944):

> [Whether] the conduct of an enterprise affects commerce among the States is a matter of practical judgment, not to be determined by abstract notions. The exercise of this practical judgment the Constitution entrusts primarily and very largely to the Congress, subject to the latter's control by the electorate. Great power was thus given to the Congress: the power of legislation and thereby the power of passing judgment upon the needs of a complex society. Strictly confined though far-reaching power was given to this Court: that of determining whether the Congress has exceeded limits allowable in reason for the judgment which it has exercised.

See also Lopez, 519 U.S. at 578 (Kennedy, J., concurring) (It is Congress' and the President's "obligation to preserve and protect the Constitution in maintaining the federal balance . . . in the first and primary instance."). In following our "[s]trictly confined" duty in this case, we must conclude that Congress has in no way "exceeded limits allowable in reason for the judgment which it has exercised." Polish Nat'l Alliance, 322 U.S. at 650. Congress acted within its Commerce Clause authority in enacting VAWA.[17]

IV.

To summarize, we hold that Brzonkala's complaint states a claim under Title IX against Virginia Tech, and under the Violence Against Women Act against Morrison and Crawford. Further, we hold that the Commerce Clause provides Congress with authority to enact the Violence Against Women Act. Accordingly, the judgments of the district court dismissing both the Title IX and Violence Against Women Act claims are reversed and the case is remanded for further proceedings.

_____

[17] Once a court has decided that a Congressional act is within the commerce power the only remaining question is whether "the means chosen by" Congress are "reasonably adapted to the end permitted by the Constitution." Hodel, 452 U.S. at 276 (quoting Heart of Atlanta Motel, 379 U.S. at 262). No party contests this point, and we hold that VAWA's civil remedy is well within appropriate congressional means.

44

No. 96-1814 - <u>REVERSED AND REMANDED</u>
No. 96-2316 - <u>REVERSED AND REMANDED</u>

LUTTIG, Circuit Judge, dissenting:

Fully aware of the importance of the matter before us today, I would unhesitatingly affirm the judgment below on the essential reasoning set forth by the district court. <u>Brzonkala</u> v. <u>Virginia Polytechnic & State University</u>, 935 F. Supp. 779 (W.D. Va. 1996). Judge Kiser's lengthy opinion is an excellent legal analysis of the constitutionality of the Violence Against Women Act under Article I, § 8, cl.3 of the Constitution. That analysis is thorough, scholarly, and, most important, abidingly faithful to the Supreme Court's decision in <u>United States</u> v. <u>Lopez</u>, 514 U.S. 549 (1995). The district court's analysis describes in detail the Supreme Court's new analytical framework for addressing Commerce Clause challenges, and meticulously and dispassionately applies the principles and reasoning from <u>Lopez</u> in addressing the challenge to the legislation at issue in this case. <u>Compare Hoffman</u> v. <u>Hunt</u>, 1997 WL 578787 (4th Cir. 1997) (same).

The district court's careful opinion brings into sharp relief not only the analytical superficiality of the majority's opinion, but also the majority's manifest misreading of the Supreme Court's historically significant <u>Lopez</u> decision and, therefore, its fundamental misunderstanding of the import of that decision and its implications for the Violence Against Women Act.

<u>Among the more profound of its errors, the majority, in complete disregard of Lopez, does not include even a single sentence -- not one -- of the "independent evaluation" of the effect on interstate commerce of the Violence Against Women Act required under that decision. See</u> Lopez, 514 U.S. at 562. Ignoring entirely the overarching change in Commerce Clause analysis wrought by <u>Lopez</u>, the majority merely recites several statements from House and Senate committees on the general problem of violence against women and the effect of that violence on the national economy, together with a sentence from a House Report stating that violence against women substantially affects interstate commerce (incidentally, never mentioning that the Senate, as opposed to the House, did not conclude that such violence

45

substantially affects interstate commerce) and then simply states, without more, that the Act is constitutional.

The majority thus reaches its conclusion that the Violence Against Women Act is a constitutional exercise of the Commerce Clause power through application of a principle of absolute judicial deference to a committee finding -- precisely what the Supreme Court held in Lopez was no longer appropriate in the review of Commerce Clause challenges to federally enacted statutes, even for findings by the full Congress. See, e.g., Lopez, 514 U.S. at 557 n.2 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. [W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." (citations and internal quotation marks omitted)).

The majority's elevation of a committee's finding not merely to preeminence among the constitutionally relevant considerations, but to a position as dispositive of the constitutional inquiry, is not at all inadvertent; to the contrary, it is quite intentional. In fact, trumpeting a misplaced reliance on United States v. Leshuk, 65 F.3d 1105 (4th Cir. 1995), the majority is at pains throughout its opinion to emphasize that it rests its conclusion entirely on the"finding" in the House Report, which it ascribes to the Congress as a whole and then accepts wholly and uncritically:

> After four years of hearings and consideration of voluminous testimonial, statistical, and documentary evidence, Congress made an unequivocal and persuasive finding that violence against women substantially affects interstate commerce. . . . Accordingly, whatever one's doubts as to whether VAWA represents a good policy decision, we can only conclude that Congress' findings are grounded in a rational basis.

Ante at 33-34 (emphasis added; citation omitted); see also id. at 30 (describing Leshuk as "rejecting a Lopez challenge to the `Comprehensive Drug Abuse Prevention and Control Act' and beginning and

46

ending our analysis by relying totally upon Congress's `detailed findings' on the interstate commerce effects" (emphasis added)); id. at 34 (again comparing majority's conclusion with that in Leshuk and characterizing Leshuk as a case where, "[w]ithout further ado we `relied upon the[ ] [congressional] findings' to hold the Commerce Clause authorized Congress to enact this statute" (quoting Leshuk, 65 F.3d at 1112; emphasis added)); id. at 43 ("Although Congressional findings are not required, here we do have abundant legislative findings evidencing that Congress did indeed ensure that the regulated activity substantially affected interstate commerce. As noted above, we relied exclusively on far less detailed Congressional findings to uphold a statute that did not regulate economic activity and had no jurisdictional element." (Emphasis added; citation to Leshuk omitted)).

The majority's wholesale deference to a committee finding would at least be understandable if that committee had made extensive findings deserving of deference. However, the majority ultimately sustains the constitutionality of the Act literally on the basis of a single sentence appearing in that committee report, which sentence is, itself, entirely conclusory.

After properly concluding that it cannot rely upon Congress' Section 5 findings in support of its Commerce Clause analysis,[1] and after

_____

[1] For its unexplained conclusion that violence against women has a substantial effect on interstate commerce and therefore is a valid exercise of Congress' Commerce Clause power, the majority properly does not rely on the findings Congress made to justify VAWA under Section 5 of the Fourteenth Amendment. Thus, the majority distinguishes between the findings made in support of Congress' exercise of its Section 5 power and the findings made in support of Congress' exercise of its Commerce Clause power, as does the Department of Justice. Compare Br. of Intervenor-Appellant United States at 4, 6-8 (detailing congressional findings on the "Impact on the National Economy and Interstate Commerce"), with id. at 9-16 (detailing congressional findings on the "Bias in State Judicial Systems"); compare also id . at 29-37 (arguing in reliance upon findings recited at 4-8 that VAWA is a valid exercise of Congress' power under the Commerce Clause), with id . at 21-29 (arguing in reliance upon findings recited at 9-16 that VAWA is a valid exercise of Congress' power under Section 5). It may be, as the Department of Jus-

47

recognizing that the bulk of its recited findings bear only on "the enormity of the problem" of domestic violence against women, not on that problem's effect on interstate commerce, see ante at 30-34, the majority is left with but a single conclusory sentence in the Report of one House to which to defer in sustaining VAWA under Article I. See ante at 32 ("crimes of violence motivated by gender have a substantial adverse effect on interstate commerce . . . ."). **2** This lone conclusory sentence constitutes the entirety of the "mountain of evidence," ante at 27, the "reams," id. at 43, the"voluminous," id. at 29, the "copious," id. at 30 n.9, the "detailed," id. at 30, the "unequivocal,"id. at 34, the "abundant," id. at 43, and the"persuasive," id. at 35, congressional findings upon which the majority upholds VAWA. This one sentence is the basis upon which the majority concludes that "it is apparent that Congress took great care to detail its findings and support its conclusions that VAWA was within its commerce authority." Id. at 43.

_____

tice contends, that congressional findings that the civil rights of women are being violated bear on the question of whether a statute impermissibly encroaches on traditional state functions. See Br. for Intervenor-Appellant United States at 32 ("An exercise of Commerce Clause power cannot plausibly be invalidated on the basis of federalism concerns where the declared purpose of the statute, supported by extensive legislative evidence, is to secure the civil rights the states have failed to protect." (emphasis added)). But, as the Department and the majority both recognize, it would be untenable to hold that such findings even bear on, much less largely resolve, the threshold question of whether violence against women has an effect on interstate commerce at all.

**2** The majority cites to only one other sentence from the four years of congressional debate in support of its holding, and that sentence from a Senate committee report does not even purport to find that gender-motivated violence substantially affects interstate commerce (although the majority seems to presume that it does). See id. at 32-33 ("Gender-based crimes and the fear of gender-based crimes restricts movement, reduces employment opportunities, increases health expenditures, and reduces consumer spending, all of which affect interstate commerce and the national economy."). The sentence speaks more to the effects of such violence on the economy in general than on interstate commerce, in any event.

48

It should go without saying that this one sentence is functionally no different from a complete absence of express congressional findings. See Lopez, 514 U.S. at 562. This single conclusory sentence no better "enables [the court] to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce," id. at 563, than would have no statement at all. Rather than the "paradigm of judicial restraint" as the majority asserts, ante at 28 (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 314 (1993)), deference to this kind of "finding" is judicial activism merely parading as restraint.

Related to its reflexive acceptance of the committee's conclusory finding as to the effect on interstate commerce of domestic violence against women, the majority, of necessity, includes scarcely even a reference to the majority opinion in Lopez in reaching its conclusion that the Violence Against Women Act is constitutional. Only after concluding that the Act is constitutional does the majority perfunctorily address the bulk of the Court's most significant pronouncements on the Commerce Clause. See, e.g., ante at 35 (noting, after holding Act constitutional on the basis of the Committee findings alone, that "nothing in Lopez requires a different result"). Thus, the majority upholds the Violence Against Women Act without so much as a mention of the economic or noneconomic character of the legislation -- much less the quite different constitutional analysis required depending upon which type of statute is at issue;[3] the presence or absence of a jurisdictional element that would ensure case-by-case that the necessary effect on interstate commerce exists; or the consequences of its holding for the "first principles" of divided powers, which the Supreme Court believed so important in the constitutional equation

_____

[3] So far afield is the majority's reasoning from that of the Supreme Court in Lopez, that the majority all but holds that the character of legislation as "economic" or "noneconomic" is irrelevant under Lopez. See ante at 42 ("The Lopez Court did not strike down § 922(q) because it regulated non-economic activity. The Court invalidated § 922(q) because neither Congress nor the Government convinced the Court that there was a rational basis for concluding that possession of a gun in a school zone substantially affected interstate commerce." (citation omitted)); id. at 42 ("Even if the regulated activity itself had to have an economic nexus . . .").

49

that it began and ended its opinion with a full discussion of them, compare Br. for Intervenor-Appellant United States at 19 (noting that principles of federalism were of "a critical concern to the Court in Lopez"). Consistent with the majority's view of Lopez as a fact-specific case of little significance, these pivotal considerations are, and plainly so, consigned to afterthought.

The majority opinion is, it should come as no surprise, categorically inconsistent with our court's recent carefully written and analyzed opinion in Hoffman v. Hunt, 1997 WL 578787, *11, wherein we upheld the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"). Indeed, the majority must resort to mischaracterization of that opinion in order to avoid the evident inconsistency with its own opinion. The majority states, in transparent legerdemain, that the court in Hoffman reviewed the congressional reports "to uphold" the Freedom of Access to Clinics Act. Ante at 34; see also id. at 34 (stating that "similarly" to Leshuk, Hoffman relied wholly on Congress' findings). However, in Hoffman we did not review the congressional reports to uphold the Act; we merely reviewed them, together with the other factors from Lopez, particularly the close and direct connection of the regulated conduct with an economic activity, in upholding the Act. The difference is obvious. Indeed, this is precisely the significance of Lopez. After Lopez, it is clear that the courts are to undertake an independent review of the relationship between the regulated activity and interstate commerce, not simply to rubber-stamp Congress' findings as to that relationship, as the majority does.

Similarly, the majority states that "[b]ecause Congress had made these persuasive findings we concluded [in Hoffman] that we did not need to `pile inference upon inference' to find a substantial effect on interstate commerce." Ante at 35. Again, however, we did not reason in this way at all. We did not say that we did not need to pile inference upon inference because Congress had made the findings; rather, and quite differently, we said that the piling of inferences was unnecessary because our own independent determination had revealed that there existed a real and substantial connection between the conduct regulated under FACE and interstate commerce. Again, the difference between Hoffman and the majority opinion, and, more importantly, between the majority opinion and Lopez, is obvious.

50

Finally, in powerful irony, at the same time that the majority decides the Commerce Clause challenge to VAWA with barely a mention of the analysis carefully laid out by the Supreme Court in Lopez, the majority does not include even a single sentence of discussion of the district court's exhaustive analysis that it summarily reverses -- an analysis which actually is, in contrast to the majority's opinion, scrupulously faithful not only to Supreme Court precedent, but to our Circuit precedent as well.

In short, the majority opinion reads, as intended, as if Lopez were never decided, holding for our Circuit, explicitly on the authority of Judge Kravitch's opinion in United States v. Wright, 117 F.3d 1265, 1269 (11th Cir. 1997), and implicitly on the reasoning advocated by the dissenting Justices in Lopez, that "`Lopez did not alter our approach to determining whether a particular statute falls within the scope of Congress's Commerce Clause authority.'" Ante at 36. Indeed, as the majority tacitly acknowledges, with understandable reluctance, it views Lopez, the most significant Commerce Clause decision in more than half a century, as an aberration, a case limited in its reach to section 922(q), of Title 18, of the United States Code. See ante at 36 & n.13 ("[I]t is unsurprising that `courts have resisted urgings to extend Lopez beyond § 922(q).'" (citations omitted)).

I suspect that, even in its discretion, the Supreme Court would not allow today's decision to stand, not only because of the decision's bold intransigence in the face of the Court's recent decision, but also because the Commerce Clause challenge to the instant statute pristinely presents the Court with the logical next case in its considered revisitation of the Commerce Clause. Because today's decision wholly ignores the Supreme Court's analysis in Lopez and conflicts directly with our recent post-Lopez decision in Hoffman v. Hunt, however, I have every hope that our own court will obviate the need for such further review.

I respectfully dissent.

51